

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

### NO. WR-80,945-01

### EX PARTE HERIBERTO SAENZ, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### CAUSE NO. 09-CR-3282-H IN THE 347TH DISTRICT COURT
### NUECES COUNTY

**ALCALA, J., delivered the opinion for a unanimous Court.**

### O P I N I O N

This is an application for a post-conviction writ of habeas corpus. TEX. CODE CRIM. PROC. art. 11.07. In an "amended"[1] application, Heriberto Saenz, Applicant, challenges his convictions for murder and aggravated assault on the basis that he received ineffective assistance of counsel at his trial. In particular, Applicant contends that trial counsel failed to impeach one of the State's witnesses, Jerry Gonzalez, with a prior inconsistent statement Gonzalez made in an interview with the police, and Applicant further contends that he was

---

[1] This is Applicant's designation, and to be consistent, we will also use it.

prejudiced as a result of counsel's error. We filed and set this application to decide whether we can consider Applicant's amended application and, if so, whether trial counsel was ineffective. We conclude that the plain language of Article 11.07 permits this Court to consider Applicant's amended application, that the doctrine of laches does not preclude our consideration of this matter, and that Applicant has established his ineffective-assistance-of-counsel claim based on counsel's failure to adequately challenge the evidence used to establish Applicant's identity as the person who committed the offense. We grant relief.

## I. Background

At around eleven at night on September 30, 2009, four people were shot in a drive-by shooting at a house on Sabinas Street in a neighborhood in Corpus Christi known as La Quare or La Quarenta. The driver reached out of the window of his vehicle as he drove by the house and shot a 9-millimeter semi-automatic pistol at the four people who were gathered outside of the house. All four people were struck by bullets, with one of them sustaining fatal gunshot wounds.

The State charged Applicant with three counts of aggravated assault for shooting Charles Castillo, who had been sitting on the porch of the house; Jose Azua, who had been standing by the front of the driveway; and Jerry Gonzalez, who had been standing by the fence in the front yard, closer to the street. The State also charged Applicant with one count of murder for killing Claryssa Silguero, who had been standing near Gonzalez.

The State's theory of the case was that Applicant was involved with Suicidal Barrio,

a Corpus Christi gang, and that he did the shooting in retaliation against the La Quarenta gang in response to a prior assault against an individual who was allegedly associated with Suicidal Barrio, Robert Pimentel. According to the State, a week before the shooting, Applicant saw a group of people from La Quarenta assaulting Pimentel, but Applicant failed to assist him. When he was assaulted, Pimentel was with Samantha and Mary Molina, whose family was involved with Suicidal Barrio. The State asserted that, because Applicant had failed to assist Pimentel during the assault, Applicant had a duty to his gang to retaliate against La Quarenta for that assault.

At trial, the State presented evidence that Applicant was involved with Suicidal Barrio and drove a truck like the one the shooter drove. Detective Rodriguez testified that, while in the hospital, Gonzalez identified Applicant as the shooter in a photospread. Detective Rodriguez also said that Gonzalez had agreed that a photograph of Applicant's truck matched the shooter's truck. Later, when he testified during Applicant's trial, Gonzalez identified Applicant as the person who shot at him.

The State also presented other evidence at trial that connected Applicant to the approximate location where the shooting occurred. Applicant's cell-phone records from the night of the shooting were introduced and compared with Global Positioning System (GPS) locations of cell-phone towers in the Corpus Christi area. The State then elicited testimony from Detective Ben Tead that, before and shortly after the shooting, Applicant had called other known or suspected members of Suicidal Barrio and was in the vicinity of the house

where the shooting had occurred.

The State further presented evidence of Applicant's statements that it maintained connected him to the drive-by shooting. Heather McCracken, a friend of Applicant's, testified that, between 10:00 p.m. and 11:00 p.m. on the night of the shooting, she and Applicant talked on the phone, and he told her that "he thinks that he was going to go hit up the Quare hood." Bo Villanueva, who was the cousin of the victim who had been murdered, testified that, while he was in the Nueces County Jail, Applicant told him that "he had did a shooting or something like that" and "it was like some Quare heads or something like that."

Applicant questioned the credibility of the State's witnesses and the plausibility of the charges. He argued that he was targeted by the police because he was involved with Suicidal Barrio and drove a red Ford F-150 truck. He urged the jury to reject Gonzalez's testimony because Gonzalez was a felon who could not be trusted, he had been manipulated by the police, and, having been shot in the back, he could not have observed the driver of the truck on the night of the shooting. Applicant pointed out that Villanueva, a felon and relative of the deceased victim, was not a credible witness. Finally, he argued that the State's evidence of motive was manufactured or, alternatively, too speculative.

Applicant was convicted and sentenced to imprisonment for seventy years for the murder count and twenty years for each of the aggravated assault counts. The Thirteenth Court of Appeals affirmed his convictions. *Saenz v. State*, No. 13-10-00216-CR, 2011 WL 578757 (Tex. App.—Corpus Christi Feb. 17, 2011) (not designated for publication).

Applicant filed an initial habeas application in September 2012, and the habeas court rendered an order designating issues. About a year later, in October 2013, Applicant filed an amended application, in which he claimed that trial counsel was ineffective for failing to impeach Gonzalez. The focus of Applicant's amended complaint was that, although trial counsel had challenged Gonzalez's identification testimony in other respects, trial counsel had failed to impeach Gonzalez's trial testimony with a prior inconsistent statement he had made in an interview with the police shortly after the shooting. In that interview, Gonzalez stated, among other things, that if he saw the shooter again, he would not recognize him.

Trial counsel responded in a sworn affidavit, and Applicant and the State deposed him. After hearing the parties' arguments, the habeas court made findings of fact and conclusions of law, in which it determined that trial counsel's performance was not deficient and that, even if it were, Applicant was not prejudiced. The habeas court also concluded, in the alternative, that Applicant's amended application was not properly before it and should not be considered because it operated as a surprise to both the State and trial counsel and thus was barred by the equitable doctrine of laches. In light of the State's arguments and the habeas court's determinations in this case, we must address the threshold procedural questions as to this Court's jurisdiction over Applicant's amended application and as to laches before considering the substantive merits of Applicant's claims.

## II. Consideration of the Amended Application Is Not Statutorily Barred

The State contends that, even when this Court has not yet ruled on an initial

application for a writ of habeas corpus, this Court should not consider an amended application as part of the initial application that was properly filed under Article 11.07.[2] The State suggests that this Court should instead consider an amended or supplemental claim under these circumstances in a separate proceeding.[3]

In support of its position, the State points to the use of the singular form of the word "application" throughout Article 11.07, and particularly in Section 4, which applies to subsequent applications seeking relief from a felony judgment imposing a sentence other than death.[4] According to the State, the phrase "initial application" contemplates a single

---

[2] By this, we mean an application that complies with the rules and procedures in Article 11.07 and Rule of Appellate Procedure 73.1. *See*, *e.g.*, TEX. CODE CRIM. PROC. art. 11.07, § 3(b) ("An application for writ of habeas corpus filed after final conviction in a felony case, other than a case in which the death penalty is imposed, must be filed with the clerk of the court in which the conviction being challenged was obtained. . . ."); TEX. R. APP. P. 73.1(a) ("*Prescribed Form.* An application filed under Article 11.07 must be on the form prescribed by the Court of Criminal Appeals.").

[3] Our analysis of this issue applies to an "initial" or "subsequent" application for purposes of Article 11.07, § 4. TEX. CODE CRIM. PROC. art. 11.07, § 4. The distinction is not relevant to the question before us.

[4] Article 11.07, § 4(a) provides, in part:

If a subsequent application for writ of habeas corpus is filed after final disposition of an initial application challenging the same conviction, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:
(1) the current claims and issues have not been and could not have been presented previously in an original application or in a previously considered application filed under this article because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;  or
(2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt.

rather than multiple applications pending before this Court, and it thus excludes amended applications such as Applicant's. As we understand the State's argument, each discrete, substantive filing or pleading by an applicant in a single proceeding constitutes a separate application under Article 11.07, and therefore each one must be addressed in a separate habeas proceeding. For the reasons explained below, we reject this position. We conclude that, without regard to whether it may properly be characterized as an additional "application," an additional pleading will not trigger the requirements of Section 4 until after final disposition of the pending application. Both this Court's jurisprudence and the plain language of Section 4 dictate this result.

As we explained in *Ex parte Torres*, Section 4 was intended to limit a convicted person seeking post-conviction habeas relief to "one bite at the apple." 943 S.W.2d 469, 474 (Tex. Crim. App. 1997); *see also Ex parte Whiteside*, 12 S.W.3d 819, 821 (Tex. Crim. App. 2000) ("We have previously determined that § 4 was intended to limit a convicted person to one bite at the apple") (internal quotation marks omitted). But we also explained that the Legislature "clearly contemplated that that bite would be a full one. The recognized corollary to requiring an applicant to raise all of his claims at once is that every claim raised in that initial *proceeding* would be considered and decided." *Torres*, 943 S.W.2d at 474 (emphasis added). Since writing this in 1997, we have not questioned its reasoning or wisdom.

---

TEX. CODE CRIM. PROC. art. 11.07, § 4(a)(1)–(2).

In general, when an applicant files amended or supplemental pleadings raising additional claims before we have disposed of his pending application, we consider the merits of his claims, so long as the pleadings comply with the rules and procedures in Article 11.07 and Rule of Appellate Procedure 73.1, and so long as the claims are otherwise cognizable and ripe for review. For example, in *Ex parte Robbins,* 360 S.W.3d 446 (Tex. Crim. App. 2011), the applicant filed a supplemental claim one month after filing his initial application, and we reviewed the merits of his claim. Similarly, in *Ex parte Jimenez*, 364 S.W.3d 866 (Tex. Crim. App. 2012), we considered a supplemental claim filed one year after the initial application was filed.[5] These cases reflect a historical willingness on this Court's part to consider the merits of amended or supplemental pleadings under these circumstances.

Furthermore, the State's proposed interpretation does not comport with the statutory language. If we were to adopt the State's interpretation and hold that "application" means each discrete, substantive filing or pleading by an applicant in a single proceeding under

---

[5] Recently, this Court has decided claims on their merits when those claims were raised in amendments to pending applications. *See Ex parte Thompson*, No. WR-63,871-03 (Tex. Crim. App. Sept. 16, 2015) (not designated for publication) (observing that "[n]othing in Article 11.07 precludes Applicant from filing a supplemental claim while his application is pending before this Court"); *see also Ex parte Seelke*, No. WR-40,196-03, 2015 WL 6182017, at *1 (Tex. Crim. App. Oct. 14, 2015) (not designated for publication) ("Because the filing of the supplement was before final disposition of the *pro se* habeas application by this Court, the supplement was timely filed in the -03 habeas proceeding."). We cite to these cases not for their precedential value but rather as examples of this Court's practice of permitting amendments to pending applications. *See Green v. State*, 374 S.W.3d 434, 453 (Tex. Crim. App. 2012) (Price, J., concurring) (observing that it has "long been the Court's established practice" to entertain amended or supplemental pleadings to an initial 11.07 habeas application that remains pending at the time of the supplemental pleadings, and further observing that this Court will "typically consider whatever matters continue to be forwarded to us from the convicting court right up to the point at which we finally rule on the habeas corpus application").

Article 11.07, the procedural bar in Section 4 would apply not only to applications "filed after final disposition of an initial application challenging the same conviction," TEX. CODE CRIM. PROC. art. 11.07, § 4(a), but also to any applications (substantive filings or pleadings) filed before a final disposition. This would be contrary to the plain language of Section 4 and would, in practice, make the initial filing or pleading trigger Section 4 in all cases in which an applicant was challenging his conviction. We decline to adopt such an interpretation that would conflict with the plain statutory language.

Because the plain language in Article 11.07 permits this Court's consideration of amended or supplemental claims filed by an applicant before final disposition of an application, we hold that we may consider Applicant's amended application under these circumstances.

### III. Applicant's Supplemental Filing is Not Barred By Laches

The State also raises the equitable defense of laches in response to Applicant's failure to raise the claims in his 2013 amended application when he filed his 2012 initial application. The State contends that Applicant's delay in filing his amended application placed it "in a less favorable position when it has already spent considerable time and effort reviewing the record of trial and examining the trial attorney with regard to the claims originally raised, but will then be forced to repeat the same process with regard to new claims." This "repetition," it says, "is inefficient, unnecessary, and prejudicial to the State." In support of its assertions, the State relies on this Court's opinion in *Ex parte Perez*, 398 S.W.3d 206 (Tex. Crim. App.

2013).

*Perez* expanded the definition of prejudice in a laches inquiry.[6] "[A]nything that places the State in a less favorable position," we observed, would now be considered when determining prejudice. *Perez*, 398 S.W.3d at 215. In *Perez*, we were concerned with the unreasonable delay between the date a conviction became final and the date an applicant filed an Article 11.07 application.[7]

We agree with the State that, in theory, it might be possible for a delay between the filing of an initial application and the amended application—here, a delay of over one year—to prejudice the State and implicate the doctrine of laches. We disagree, however, that these particular facts establish laches. While we recognize the demands that Article 11.07 applications might place on the State, we decline to hold that the meaning of prejudice is so broad that it will, as a general matter, encompass the type of hardship incurred by the State in responding to amended and supplemental claims in Article 11.07 applications. In general, the doctrine of laches is intended to address the broader interests of the criminal-justice system, such as prejudice to the State's ability to prosecute a defendant or to respond to allegations due to the loss of evidence, rather than being focused on the ills of repetition and wasted resources caused by an applicant's failure to act more quickly in raising his claims.

---

[6] Before *Perez*, when determining if the State was prejudiced by an applicant's delay in filing an Article 11.07 application after his conviction became final, we focused on the State's ability to respond to the claims in an application. *Ex parte Carrio*, 992 S.W.2d 486, 488 (Tex. Crim. App. 1999).

[7] In *Perez*, the applicant's conviction became final in 1992, but he waited until 2011 before filing his first Article 11.07 application.

Furthermore, as this Court explained in *Perez*, the equitable doctrine of laches must not be applied mechanically, but rather may be applied only after a weighing of equitable interests as they appear from the facts of each case. *See id.* at 216. Here, having weighed the equities, we conclude that they militate in favor of considering the merits of Applicant's supplemental claim.

We do not discount the State's interest in the orderly disposition of Article 11.07 applications;[8] this is a legitimate interest that we have acknowledged when an applicant abuses the writ process. *See, e.g.*, *Ex parte Jones*, 97 S.W.3d 586, 588 (Tex. Crim. App. 2003) ("We still should not and will not tolerate the filing of perjurious or forged material in writs of habeas corpus. Particularly in this era of governmental budgetary restraint, we cannot condone the waste of scarce judicial and fiscal resources that frivolous filings cause."). However, this interest is not necessarily infringed upon merely because an applicant properly files an amended or supplemental claim before we dispose of his pending application. Without more than that the amended application necessitates redundant effort or extra time on the part of the State, we cannot find that the State is prejudiced. Because we conclude that laches is inapplicable, we now turn to the merits of Applicant's ineffective-assistance-of-trial-counsel claim.

### IV. Applicant's Trial Counsel Was Constitutionally Ineffective

Applicant contends that his trial attorney was ineffective by failing to adequately

---

[8] In fiscal year 2014, we disposed of 4,733 Article 11.07 applications. ANNUAL STATISTICAL REPORT FOR THE TEXAS JUDICIARY: FISCAL YEAR 2014 (Office of Court Administration).

cross-examine the chief witness against him with his prior inconsistent statements. We sustain that complaint after explaining the applicable law, examining the evidence that trial counsel acted deficiently, and detailing why Applicant was prejudiced as a result of counsel's error.

**A. Applicable Law**

Under *Strickland v. Washington*, Applicant has the burden of showing by a preponderance of the evidence that counsel's conduct was deficient—that is, that counsel's representation fell below an objective standard of reasonableness and was not the "result of reasonable professional judgment"—and that, but for his deficient conduct, there is a reasonable probability that the result of the proceeding would have been different. 466 U.S. 668, 688–94 (1984); *Ex parte Chandler*, 182 S.W.3d 350, 353–54 (Tex. Crim. App. 2005). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694. There is a strong presumption that counsel's conduct was reasonable, and judicial scrutiny of counsel's conduct is highly deferential. *Id.* at 689–91. When determining whether a defendant was prejudiced, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.* at 694; *see also Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (discussing the materiality standard in *United States v. Bagley*, 473 U.S. 667 (1985), and noting that the "question is not whether the defendant

would more likely than not have received a different verdict with the evidence. . . .”). These are not, however, mechanical rules. The "ultimate focus of inquiry," the Supreme Court explained in *Strickland*,

> must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.

466 U.S. at 696; *see also Ex parte Flores*, 387 S.W.3d 626, 633 (Tex. Crim. App. 2012) ("This Sixth Amendment right to counsel preserves the fairness, consistency, and reliability of criminal proceedings by ensuring that the process is an adversarial one.").

## B. Deficient Performance

In Applicant's case, the police interviewed Gonzalez one day after the shooting while he was in the hospital. Gonzalez told the police that the shooter was driving a red, single-cab Ford truck without tinted windows and with a side step and a short bed. He guessed that the year of the truck was an '03 or '04. He also said that the shooter stopped at one of the darkest places and that he saw the shooter's face but could not make it out. The police then asked Gonzalez if he would recognize the shooter if he saw him again. He answered that he would not and agreed that he only saw a gun come out of a window. Gonzalez's out-of-court statement was clearly inconsistent with his in-court identification of Applicant and Detective Rodriguez's testimony that Gonzalez identified Applicant in a photospread.

Trial counsel conceded at his deposition that he knew Gonzalez had told the police in his interview that he would not recognize the shooter if he saw him again. Asked why he

failed to impeach Gonzalez, trial counsel explained, "I would have. I—I'm—I used everything. The lighting, the darkness. The—everything." He agreed that his failure to impeach Gonzalez "would have been a mistake" and that, had he thought of it at the time, he "would have brought [the prior inconsistent statement] out." He would have argued to the jury that Gonzalez "couldn't make that identification and the police suggested to him who [it was]—and I think that was the argument that I made, you know." But trial counsel could not explain why he had failed to impeach Gonzalez. Asked if he made a strategic decision not to do so, he answered, "I may have overlooked it if it's not on the record, but I was aware of it."

The habeas court concluded that trial counsel made a reasonable strategic decision not to impeach Gonzalez. We disagree.

Rule of Evidence 613(a) permits a party to impeach a witness with a prior inconsistent statement, provided that the proper predicate is laid. TEX. R. EVID. 613(a). We conclude that Gonzalez's statement to the police was a prior inconsistent statement under Rule 613(a) and that Gonzalez could have been impeached had the proper predicate been laid.

In its findings and conclusions, the habeas court surmised that trial counsel might reasonably have declined to impeach Gonzalez because his statement to the police contained other evidence damaging to Applicant's defense, in that Gonzalez told the police that the shooter yelled, "SB," and that the truck had a side step. If this case were before us on a petition for discretionary review with an undeveloped record, this speculation might be well founded. As we wrote in *Garcia v. State*, "[I]n the absence of evidence of counsel's reasons

for the challenged conduct, an appellate court 'commonly will assume a strategic motivation if any can possibly be imagined,' . . . and will not conclude the challenged conduct constituted deficient performance unless the conduct was so outrageous that no competent attorney would have engaged in it." 57 S.W.3d 436, 440 (Tex. Crim. App. 2001) (quoting 3 W. LaFave, et al., *Criminal Procedure* § 11.10(c) (2d. ed 1999)).[9] *Garcia* relied, in part, on *Thompson v. State*, a case that was also before us on a petition for discretionary review. There, we wrote:

> A substantial risk of failure accompanies an appellant's claim of ineffective assistance of counsel on direct appeal. Rarely will a reviewing court be provided the opportunity to make its determination on direct appeal with a record capable of providing a fair evaluation of the merits of the claim involving such a serious allegation. In the majority of instances, the record on direct appeal is simply undeveloped and cannot adequately reflect the failings of trial counsel.

9 S.W.3d 808, 813–14 (Tex. Crim. App. 1999). Taken together, *Garcia*, *Thompson*, and other such cases[10] abide by the principle in *Strickland* that there is a strong presumption that

---

[9] In subsequent cases, we have cited *Garcia* for authority but without quoting the clause at the beginning of this sentence. *See, e.g.*, *Bone v. State*, 77 S.W.3d 828, 833 n. 13 (Tex. Crim. App. 2002); *Andrews v. State*, 159 S.W.3d 98, 101 (Tex. Crim. App. 2005); *Ex parte Miller*, 330 S.W.3d 610, 616 n. 9 (Tex. Crim. App. 2009).

[10] *See, e.g.*, *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) ("Direct appeal is usually an inadequate vehicle for raising such a claim because the record is generally undeveloped. This is true with regard to the question of deficient performance—in which counsel's conduct is reviewed with great deference, without the distorting effects of hindsight—where counsel's reasons for failing to do something do not appear in the record."). Well before we adopted the standards in *Strickland*, we recognized that "[e]xperience has taught us that in most instances where the claim of ineffective assistance of counsel is raised, the record on direct appeal is simply not in a shape, perhaps because of the very alleged ineffectiveness below, that would adequately reflect the failings of trial counsel." *Ex parte Duffy*, 607 S.W.2d 507, 513 (Tex. Crim. App. 1980), overruled by *Hernandez v. State*, 988 S.W.2d 770 (Tex. Crim. App. 1999).

counsel's conduct was reasonable. These cases recognize, too, that an ineffective assistance of counsel claim "must be firmly founded in the record." *Id.* at 813.

Unlike in *Garcia* and *Thompson*, the record in Applicant's case was developed, and trial counsel was able to adequately respond to the allegations of ineffectiveness at his deposition.[11] Counsel conceded that it would have been a mistake not to impeach Gonzalez and that such an omission likely would have been a product of oversight on his part. Thus, on the whole, counsel's testimony at the deposition indicated that his decision was not strategic. Because "our independent review of the record reveals that the trial judge's findings and conclusions are not supported by the record," we will exercise our authority to make contrary findings and conclusions. *Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008). Accordingly, as the ultimate factfinder in habeas proceedings, we decline to adopt the habeas court's finding that trial counsel might have made a reasonable strategic decision not to impeach Gonzalez. *See id*.

Trial counsel's failure to articulate a strategic reason for not impeaching Gonzalez does not mean that his conduct was *per se* deficient. *Strickland* requires courts to judge counsel's conduct by an objective standard of reasonableness. A decision that counsel defends as trial strategy might nonetheless be objectively unreasonable; the magic word

---

[11] The habeas court found that the amended application operated as a surprise to both the State and trial counsel, "such that they were not given a fair and adequate opportunity to respond to the newly raised claims of ineffective assistance of counsel." While trial counsel conceded at his deposition that he was not prepared for the claims in the amended application, he said, "I don't mind it. I—everything I said is just the way it happened, so it's not going to change."

"strategy" does not insulate a decision from judicial scrutiny. *Ex parte Ellis*, 233 S.W.3d 324, 330 (Tex. Crim. App. 2007). Likewise, a decision not motivated by strategy might be objectively reasonable.

For two reasons, we conclude that it was objectively unreasonable for trial counsel not to impeach Gonzalez, even if, by doing so, he would have "opened the door" to other unfavorable evidence in Gonzalez's statement. First, impeaching Gonzalez's identification of Applicant would have been consistent with trial counsel's stated strategy. Early on in Applicant's trial, for example, trial counsel asked Gonzalez, "So if you are getting shot in the back, you are not looking at the person who is shooting you, right?" Trial counsel pointed out that Gonzalez told the police that he was on the porch, not by the front gate of the fence, when the shooting began. Trial counsel also elicited from Gonzalez that the porch was approximately thirty feet from the street. Finally, in his closing argument, trial counsel urged the jury to reject Gonzalez's testimony:

> After the shots, [Gonzalez] went down. He says he had got a clean, clear view. He is the only one there that got a clean clear view and he got three bullet shots and they are all in the back. They are all back entries. Come on, give me a break. It's dark. He is not even that close when the gun goes off.

Second, Gonzalez's inconsistent statement to the police was critical to the reliability of his identification of Applicant as the shooter. The prior inconsistent statement was the one piece of evidence that could have substantially neutralized Gonzalez's in-court identification of Applicant as the person who committed the shooting and Detective Rodriguez's testimony that Gonzalez identified Applicant as the shooter in a photospread. Although the record

shows that trial counsel challenged the reliability of Gonzalez's identification of Applicant through other avenues, none of those avenues were as damaging to Gonzalez's reliability as his prior statement shortly after the shooting that he did not believe that he would be able to identify the shooter. We hold that trial counsel's failure to impeach Gonzalez with his prior inconsistent statement was deficient conduct.

### C. Prejudice

We now consider whether Applicant was prejudiced by trial counsel's failure to impeach Gonzalez. Applicant contends that he was prejudiced because no credible evidence tied him to the shooting, the State's case relied heavily on evidence from cell-phone records placing him in the vicinity of the shooting, the State's witnesses were biased and not credible, the State manufactured a motive based on speculation, and the trial was "poisoned" with evidence that Applicant was a member of Suicidal Barrio.

The habeas court concluded that, even if trial counsel was deficient for not impeaching Gonzalez, Applicant was not prejudiced. We disagree because the evidence establishing Applicant's identity as the person who committed the drive-by shooting was weak, and it rested heavily on the reliability of Gonzalez's identification, which would have been severely crippled by his prior inconsistent statement denying his ability to identify the shooter.

Gonzalez was a key witness in the State's case, a fact the State stressed in its closing argument. "Who," it asked, "is the next best witness [besides the deceased Silguero]? Who

is closest to the gate? Who is closest to the street? Jerry Gonzalez." Indeed, Gonzalez's identification put Applicant in the driver's seat of the truck and was direct evidence of his guilt. No other eyewitness placed Applicant in the truck during the shooting. Had the jury learned that Gonzalez told the police that he could not make out the shooter's face and would not recognize him again, the credibility of his identification would have been substantially undermined.

Gonzalez's identification was crucial to the State's case given that the other witnesses at trial were unable to identify Applicant as the shooter. During her investigation, Detective Rodriguez showed a photospread to "probably" six people, and Gonzalez was the only person who identified Applicant as the shooter. The other witnesses could identify only the type or color of the vehicle or a general description of the person involved in the shooting. For example, Savannah Escamilla, a neighbor of the house where the drive-by shooting occurred, testified that she saw a red two-door truck. Roseann Perez, who saw the shooting from nearby, testified that she saw one man in a truck. She agreed that the truck was a red F-150 with chrome or silver stepping and without tinted windows. She had never seen the driver before, and although she saw only the side of his head, she stated that his hair was short. Jose Azua, who was shot in the chest and legs, saw a new, red F-150 truck with two doors, the shooter's eyes and his short hair or bald head, and the barrel of a gun. Castillo, who was shot in the leg, saw a truck, but he could not describe it with more particularity. Candice Sanchez, a neighbor, saw a man in a black or red truck.

Arguably the most incriminating evidence against Applicant was the testimony of his

friend McCracken. McCracken's testimony, however, was largely speculative. Between 10:00 p.m. and 11:00 p.m. on the night of the shooting, McCracken and Applicant talked on the phone. Applicant told her he was driving around trying to figure out what movie to watch. He put her on hold and returned after a couple of minutes. According to McCracken, he then told her "he thinks that he was going to go hit up the Quare hood." After hearing this, McCracken heard a "chik, chik" and told Applicant that that was "stupid." Applicant responded that "he had to do what he had to do." McCracken could not say what Applicant meant by this. But the following morning, she heard that Silguero had been shot, and she believed that Applicant was the shooter. She explained, "I felt in my heart. It is like I knew in my heart—that he did it."

On cross-examination, McCracken agreed that, when Applicant said he was "going to go hit up the Quare hood," that could have meant "drive by there, like just cruise, or stop by there, go fight over there, obviously, go shoot." She also said that, when talking to Applicant, she heard a "slide or [a] click," but she did not ask Applicant if he had a gun with him. "I wasn't for sure—I was for sure that I knew what I heard. I just didn't want to, I guess believe," she said. McCracken repeated that, after learning that Silguero had been shot, she had a "gut feeling" that Applicant was the shooter. On further questioning from the State, she agreed that Suicidal Barrio was "everything" to Applicant and was "all over" his MySpace page.

The State presented evidence that, on the night of the shooting, Applicant was in the general vicinity of the house where the shooting occurred before and shortly after the

shooting, but that evidence was indefinite because the general vicinity could have included approximately one-fourth of a mile in distance. Detective Tead compared Applicant's cell-phone records subpoenaed from T-Mobile with the GPS locations of T-Mobile cell-phone towers in the Corpus Christi area. Tead testified that he was able to determine what calls were made or received on Applicant's cell phone and the rough location of his cell phone before and shortly after the shooting.[12] According to Tead, at 10:32 p.m., Applicant made a thirty-second call to Anthony Curiel, a known member of Suicidal Barrio, in a sector of a cell tower covering a "serviceable area which include[d] the location of the murder." At 10:39 p.m., 10:48 p.m., and 11:05 p.m., calls were placed between Applicant and his girlfriend, Rebecca Mills. At 11:08 p.m., Applicant called a number that Tead believed was used by Israel Mendoza, and at 11:09 p.m., Applicant called Javier Solis. Tead testified that both Mendoza and Solis were known members of Suicidal Barrio. Later on that night, Applicant made other calls to Solis and Mills. According to Tead, during many of these calls Applicant was in the general vicinity of the house where the shooting occurred, but Applicant's precise location was undetermined in that he could have been in any area that, on average, could be one-fourth of a mile in distance from the nearest cell-phone tower to the house.[13] Tead also acknowledged that the only thing he could determine was that a

---

[12] During his testimony, Tead relied on maps he had prepared for each call that was made to and from Applicant's cell phone. Each map included the location of a cell tower and that tower's color-coded sector used by Applicant's cell phone. If his phone used multiple cell towers or sectors, the map included these. Many of these maps also included the location of the shooting.

[13] The record shows the following excerpt from Tead's testimony:

person was inside a sector when he made or received a call on his cell phone.

The State relied on a purported admission from Applicant as having committed the shooting, but the source of that evidence, Villanueva, was questionable. Villanueva had a criminal history, a motive to falsify his statements, and his description of the offense was inconsistent with the other evidence. Villanueva, the murder victim's cousin, testified that Applicant admitted to him that he committed a shooting. Villanueva had been placed on probation for retaliation against a public servant and was being held in the Nueces County Jail for violating his probation. By the time of Applicant's trial, his probation had been revoked, and he had been sentenced to imprisonment. He testified that, while he was in a holding cell, Applicant told him he "did a shooting." According to Villanueva, "He just said like he said he did it. He said he did a shooting like that. I asked him what he used. He said—he said he used a nine or something like that." After talking to Applicant, Villanueva said that he also learned that Silguero, his cousin, had been shot. He denied receiving anything in exchange for his testimony or having knowledge of the shooting until talking to Applicant in jail.

---

Q.     Okay. And the sector—my question to you is: Approximately how much area is contained in this sector? Your response was three quarters of a mile.

A.     Actually, my response was: It depends on which cellular tower and how close other cellular towers are. But if I were to take an average estimate, I would say that the diagonal length here would be approximately a quarter of a mile. Again, that totally depends on which cellular tower we are talking about.

Q.     What you are telling this jury is you don't know?

A.     I am telling the jury that it depends on which cellular tower we are talking about.

When questioned by trial counsel, Villanueva's story changed. Trial counsel elicited that, after talking to Applicant, Villanueva stated in a recorded interview with detectives that Applicant told Villanueva that he and Henry Ayala "did a shooting." Trial counsel then asked Villanueva, "You told the detectives two people did the shooting?" He responded, "That's right because that's what he told me and they asked me that." Villanueva denied that his story had changed, and trial counsel continued to question the veracity of his testimony:

> Q. And of what you heard, who did the shooting, Heriberto or Henry Ayala? Remember what you told the detectives?
> A. Yes, sir.
> Q. What did you tell them?
> A. That two people were involved in the shooting but—
> Q. And who did the actual shooting?
> A. I said I didn't know.

After the State rested, trial counsel called Mario Rocha as a witness to impeach Villanueva's testimony. Rocha was being held in the Nueces County Jail on pending charges for delivery of a controlled substance and had previously been sentenced to prison for forgery and attempted escape. He knew Villanueva because they had been in the "tank" together. According to Rocha, he learned from Villanueva that Applicant told Villanueva that "he didn't do the shooting but that he was arrested for it." Rocha testified that Villanueva then told others in jail that he intended to go to court and lie.

On cross-examination, the State asked Rocha, "So what you are telling this jury is that to impress you and strange people, Mr. Villanueva is putting his life at risk announcing I am a snitch, knowing that snitches get stitches?" "Basically times changed," Rocha answered. "You would be surprised what those inmates are doing in there."

Finally, the State argued that Applicant was the shooter because he had to "handle up" and "man up" after failing to assist Robert Pimentel as Pimental was being assaulted by a group from La Quarenta, possibly because of Pimentel's association with members of Suicidal Barrio. The evidence supporting this motive was insubstantial.

Pimentel testified that, a week or month before the shooting, he was assaulted by people from "Quare" in a Taco Bell parking lot across from Ray High School. He had fought one of "Quare's" people weeks earlier and speculated that they now "wanted more so they came at me again and they jumped me." He acknowledged that he knew and went to school with Samantha Molina, whose family was involved with Suicidal Barrio; that Samantha and her mother Mary were with him when he was assaulted; and that Mary tried to defend or protect him. He also agreed that, during the assault, he saw one person in a red pickup truck with chrome steps. But he could not say who was in it, and after being assaulted, he looked up and saw that the truck was no longer there. He also denied that the assault had anything to do with Applicant and was unwilling to speculate that Applicant was the driver of the red pickup truck.

Even if Applicant were the driver of the truck that Pimentel saw, the evidence of motive was not strong. In its closing, the State argued that Pimentel "was part of his [Applicant's] group because of the relationship with the Molinas." Applicant, the State went on, failed to "take care of his business" when Pimentel was assaulted "because he drove off from the scene," rather than staying behind to assist "his people." Nothing in the record indicated, however, that Pimentel was directly involved with Suicidal Barrio, and Pimentel

denied knowing Applicant. Although the Molina family was involved with Suicidal Barrio, the State presented no evidence that the assault on Pimentel was aimed at a member of Suicidal Barrio.

As the Supreme Court has explained, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696. Applying that principle here, given the relatively weak evidence of Applicant's guilt and the weight of Gonzalez's identification, we hold that there is a reasonable probability that, but for counsel's failure to impeach Gonzalez with his prior inconsistent statement to the police, the result would have been different.

## V. Conclusion

We grant relief.[14] The judgment in cause number 09-CR-3282-H in the 347th District Court of Nueces County is set aside, and Applicant is remanded to the custody of the Sheriff of Nueces County to answer the charges in the indictment. The trial court shall issue any necessary bench warrant within ten days after the issuance of this Court's mandate.

Copies of this opinion shall be sent to the Texas Department of Criminal Justice–Correctional Institutions Division and Pardons and Paroles Division.

Delivered: April 6, 2016

Publish

---

[14] Because we are granting relief, we need not address Applicant's other claims.