Opinion issued August 4, 2016



In The

# Court of Appeals

For The

## First District of Texas

————————————

### NO. 01-14-01006-CR

————————————

**CHARLES RAY CARTER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 337th District Court**
**Harris County, Texas**
**Trial Court Case No. 1399940**

---

### O P I N I O N

A jury convicted appellant, Charles Ray Carter, of murder, and the trial court

assessed punishment at 50 years' confinement. In a single point of error, appellant

contends the trial court abused its discretion in denying his motion for new trial, which was based on allegations of ineffective assistance of counsel. We affirm.

## BACKGROUND

In the early hours of September 1, 2013, appellant shot Earl Green to death; the question for the jury was whether the shooting was justified.

**Events Before the Shooting**

According to Freda Wilson, who had been Green's mistress for thirteen years at the time of trial, Green had become convinced that appellant and Freda were sleeping together. Demond Frank testified at trial that there had been "an issue ongoing between the defendant and [Green] about Freda" and they had been in a physical fight over it in the past.

Freda Wilson testified that she, Green, and other family members had spent the evening fishing. She and Green returned to her home around one in the morning. While they were unpacking Green's Jeep outside Freda's trailer, appellant pulled up. He appeared angry and mad, but Freda did not think he was mad at her or Green. Freda stated appellant had a gun in one hand and a pack of bullets in the other, but he was was not pointing the gun at anyone.

> Q. So, once he got out of the car and you said he was mad, what happened next?
>
> A. [Green] asked him what he was doing there. And he said, Man, Green, this is not for us.

Q. I am sorry. What was that?

A. Man, Green, this is not for us.

Q. And then what happened next?

A. Then [Green] started chasing him around the car.

Q. So it was [Green] chasing the defendant around the car; is that correct?

A. Yes.

According to Freda, while Green was chasing appellant around the car, Green said that he was going to get appellant. Freda grabbed Green and held him, and Green told appellant to leave. Green was upset and appellant left. Freda testified that as appellant was leaving, he said, "You better be glad my cousin loves you or not (sic) I would kill you." Freda continued to hold Green back for a few minutes, and when she released him, Green left.

**The Shooting**

Demond Frank, appellant's cousin, testified that he had been at a club in La Porte and, after he left there at about one a.m., he went to Jennifer Dangerfield's house. Jennifer was not there yet, but her sister, Nathanielle Blake, and Dameeka Moore were there. Frank talked with the two women until appellant drove up about 10 minutes later. Frank went to the curb to talk to appellant through the passenger-side window. At first he was leaning on the car while they talked, then appellant started rolling forward, and Frank walked along by the car as they continued talking.

3

Frank testified that appellant was holding a gun. Appellant seemed nervous and said that earlier Green had accused him of sleeping with Freda. Frank spotted Green's Jeep heading toward them from the opposite direction of appellant's car: "[Green] shot up on us and all I heard was say, [n****r], and I seen (*sic*) blue fire. I drove (*sic*) on the ground." Frank heard more than one shot.

After the shooting, Green's Jeep rolled backward toward a field. Frank testified that when he checked on Green he was "gone," so Frank drove off to look for appellant, who had driven away slowly after the shooting. Frank spoke with appellant later in the morning, and appellant said that he was going to turn himself in.

**After the Shooting**

Andre Godfrey and Jennifer Dangerfield were on the way to her home from a club in La Porte when Jennifer received a telephone call about a shooting near her house. On arrival at Jennifer's home, the pair saw "a Jeep backed up in the street in a field." Andre knew the Jeep belonged to Green. The Jeep was still running when he and Jennifer approached it and found Green, unconscious and bleeding, "face[] down between the seats." Andre testified he went to a nearby house and got his cousin, Mark Patterson, and his friend, Clarence Williams, to come help. Meanwhile, Jennifer called 911 and was told by the dispatcher to get Green out of the Jeep and try to administer CPR.

4

Andre and Mark lifted Green out of the Jeep, and Jennifer, then Mark, attempted to revive him. Andre estimated the paramedics or police arrived about 30 to 45 minutes later. Andre said he neither saw anyone approach the Jeep during that time, nor did he see anything in the Jeep; specifically, he did not see a gun.

Mark Patterson testified that he and some friends had been partying outside his house when Andre arrived. Mark's house was about two blocks from the homicide scene. Mark and Clarence Williams went to the scene with Andre. When they arrived, Mark saw Jennifer in the road and the Jeep with its lights on. He saw no one else. He said he got Green out of the Jeep, and that Andre might have helped. Jennifer, then Mark, performed CPR, but they were unable to resuscitate Green.

The prosecutor asked Mark if he had heard the shots since he lived only two blocks away, and he replied that he had heard some shots about 35 minutes before Andre arrived. While he was there, he saw no one approach the Jeep or take anything out of it. He never saw a gun in the Jeep.

## INEFFECTIVE ASSISTANCE OF COUNSEL

In his sole point of error, appellant contends that

[t]he trial court abused its discretion in denying the motion for new trial because no reasonable view of the record could support the trial court's ruling. The totality of representation demonstrates defense counsel at trial failed to investigate the law or facts of the case or to adequately prepare for either phase of trial.

5

Specifically, appellant contends that, at the guilt-innocence phase of the trial, defense counsel failed to (1) investigate or introduce evidence of gunshot residue [GSR] on the decedent's hands; (2) seek out fact witnesses; and (3) call an expert or cross-examine the State's expert about whether shell fragments of "undetermined origin" indicated that the decedent had fired a weapon. Appellant also argues that he received ineffective assistance of counsel at the punishment phase of the trial because defense counsel called only two witnesses to testify on his behalf, and "it would have been easy for [defense counsel] to find people in the community who would have been available to testify to [appellant's] good reputation in the community, as well as [the decedent's] capacity for violence." We address each issue respectively.

**Standard of Review**

We review a trial court's denial of a motion for new trial under an abuse of discretion standard. *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004). When the motion alleges ineffective assistance of counsel, we must determine whether the trial court's finding on the ineffective assistance argument and subsequent denial of the motion for new trial were "so clearly wrong as to lie outside the zone of reasonable disagreement." *Keller v. State*, 125 S.W.3d 600, 606–07 (Tex. App.—Houston [1st Dist.] 2003), pet. dism'd, improvidently granted, 146 S.W.3d 677–78 (Tex. Crim. App. 2004).

6

To be entitled to a new trial based on a claim of ineffective assistance of counsel, a defendant must show, by a preponderance of the evidence, that (1) counsel's performance was so deficient that he was not functioning as acceptable counsel under the Sixth Amendment and (2) the deficient performance prejudiced the defendant: "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Andrews v. State*, 159 S.W.3d 98, 101–02 (Tex. Crim. App. 2005) (citing *Strickland v. Washington*, 466 U.S. 668, 687–96, 104 S. Ct. 2052, 2064–69 (1984) and *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999)).

"Appellant bears the burden of proving by a preponderance of the evidence that counsel was ineffective." *Thompson*, 9 S.W.3d at 813. "When handed the task of determining the validity of a defendant's claim of ineffective assistance of counsel, any judicial review must be highly deferential to trial counsel and avoid the deleterious effects of hindsight." *Id.* (citing *Ingham v. State*, 679 S.W.2d 503, 509 (Tex. Crim. App. 1984)).

We indulge in a strong presumption that counsel's conduct fell within the wide range of reasonable assistance and that the complained-of action or omission might be considered sound trial strategy. *Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012). "The mere fact that another attorney might have pursued a different tactic at trial does not suffice to prove a claim of ineffective assistance of

counsel." *Id.* "The *Strickland* test is judged by the 'totality of the representation,' not by counsel's isolated acts or omissions, and the test is applied from the viewpoint of an attorney at the time he acted, not through 20/20 hindsight." *Id.*

Trial counsel's failure to articulate a strategic reason for his action or inaction does not mean that his conduct was per se deficient. *Ex parte Saenz*, No. WR945–1, 2016 WL 1359214, at *8 (Tex. Crim. App. April 6, 2016). *Strickland* requires courts to judge defense counsel's conduct by an objective standard of reasonableness. *Id.* A decision that counsel defends as trial strategy might nonetheless be objectively unreasonable; the magic word "strategy" does not insulate a decision from judicial scrutiny. *Id.* (citing *Ex parte Ellis*, 233 S.W.3d 324, 330 (Tex. Crim. App. 2007)). Likewise, a decision not motivated by strategy might be objectively reasonable. *Id.*

Moreover, after proving error, the appellant must affirmatively prove prejudice from the deficient performance of his attorney. *Hernandez v. State*, 988 S.W.2d 770, 772 (Tex. Crim. App. 1999); *Burruss v. State*, 20 S.W.3d 179, 186 (Tex. App.—Texarkana 2000, pet. ref'd). The appellant must prove that his attorney's errors, judged by the totality of the representation and not by isolated instances of error, denied him a fair trial. *Burruss*, 20 S.W.3d at 186. It is not enough for the appellant to show that the errors had some conceivable effect on the outcome of the proceedings. *Id.* He must show that there is a reasonable probability that, but for his attorney's errors, the jury would have had a reasonable doubt about his guilt

8

or that the extent of his punishment would have been less. *See id.*; *see also Bone v. State*, 77 S.W.3d 828, 836–37 (Tex. Crim. App. 2002).

## Guilt-Innocence

### Failure to Introduce Gunshot Residue Evidence

Appellant contends that defense counsel was ineffective for failing to present evidence that the decedent, Green, had GSR on his hands, and that such evidence was critical because it "was at least some evidence supporting the self-defense theory but the jury did not hear about it." Appellant's argument regarding the GSR evidence appears to be two-fold: (1) defense counsel did not even know about the GSR evidence until after the trial, and (2) if he did know, he was ineffective for failing to present it at trial. We address each argument respectively.

Appellant testified by affidavit at the motion for new trial that, after his conviction, defense counsel looked at the autopsy report and noticed that Green had GSR on his hands. Appellant said that defense counsel "asked me not to let anyone in the community know that he had missed that information before the trial and to have my wife call him as soon as possible." Defense counsel also mentioned filing a new trial based on the GSR. Similarly, Alan Merrill, the person who had referred appellant to defense counsel, testified that on the day of the conviction, defense counsel said that there was no GSR on Green, but later told him that GSR had, in fact, been found on Green's hands.

9

In contrast, defense counsel testified that he did know about the GSR before trial, but chose not to make an issue of it at that time for reasons detailed below. Defense counsel explained that he had mentioned the GSR to appellant in connection with a motion for new trial based "in the interest of justice," not as newly discovered evidence.

The trial court was entitled to believe defense counsel's testimony that he knew about the GSR evidence before trial, and disbelieve appellant's and Merrill's testimony to the contrary. *Keeter v. State*, 74 S.W.3d 31, 38 (Tex. Crim. App. 2002) (holding at motion for new trial, factfinder is free to believe or disbelieve testimony of any witness).

Appellant also argues that, even if defense counsel knew of the GSR evidence, he "failed in fulfilling his professional duty to put before the jury a highly significant piece of the puzzle of why [appellant] fired the gun at [Green]." Thus, we must decide whether defense counsel's strategic choices regarding the GSR were objectively reasonable. *See Saenz*, 2016 WL 1359214, at *8.

When questioned at the motion for new trial hearing about his strategy regarding the GSR evidence, defense counsel testified as follows:

Q. What was your reason for not mentioning gunshot residue?

A. The expert that testified at the time of trial, I asked questions in regards to did you find evidence that Earl Green had fired a weapon. Based upon that answer and him saying no, I didn't want to go into it any further and him justify why finding gunshot residue on Earl Green,

10

and also the report suggesting they found gunshot residue on two other [witnesses]— actually, three other persons.

. . . .

I had done some research earlier on that once I received the reports. I reviewed the reports. I found that there was gunshot residue on three persons that tried to help Mr. Green that night. I found there was gunshot residue in the vehicle. I found gunshot residue on both his hands, which to me indicated the allegation is he shot a gun with both hands versus one, then that might seem a little improbable. I was aware of the fact that three people arrived on the scene to help him, which would explain, by taking the body and moving it out of the vehicle, that they may get contents on them. Questioned in trial extensively about the scene, the contamination of the scene, how things might appear differently than when the officers arrived. I knew three people helped him out of the car. And I also concluded that when Mr. Green was shot that the gunshot residue either sprayed on his hands or by him touching the wound. Through the investigations that I did and research that I looked at, that was possible.

The fact that there was no gun found on Mr. Green, the fact that there was no gun—bullet holes in [appellant's] vehicle, the approach at the time was to present a case that showed Mr. Green to be aggressive and had aggressive actions toward [appellant], and hopefully the jury discounts the fact or not consider the fact that Mr. Green didn't have a weapon. Had a weapon been found, then we would have considered approaching and using gunshot residue in conjunction to a weapon being found.

Q: So, your reason for not introducing the gunshot residue or evidence of gunshot residue was because you were hoping that a jury would not even look at the issue of whether or not there was a weapon?

A: In conjunction with the testimony of the medical expert and the forensic expert.

Q. So, you thought—your thinking was ultimately I'm not going to introduce the gunshot residue evidence because I think the jury may be able to acquit him without there being any evidence of there being a gun?

11

A.  Correct.  And we voir-dired on that issue, we talked at length about that issue, and that was clearly the approach in trial.

Q. So, the fact that there was gunshot residue evidence, you decided— you made the decision not to introduce it.

A. Yes, I did.

In defense counsel's affidavit, which was admitted at the motion for new trial hearing, he further explained his strategic reasoning.

I was aware at the time of trial that gunshot residue (GSR) was found on the hands of the victim.  However, I was also aware that GSR was found on the hands of the witnesses who pulled the victim from the car and attempted to do CPR on him, and I believed that introducing evidence of GSR would unnecessarily confuse the jury without explaining where the gun supposedly fired by the victim had disappeared to.  The GSR on the victim's and witness[es]' hands also contradicted the fact that no gun was recovered from the victim's car, no shell casings were recovered from the victim's car, and there was no evidence whatsoever of any bullet strikes to the Defendant's vehicle, despite the fact that the vehicles were at nearly point blank range when the Defendant fired into the victim's car.  In trying the case and presenting the case to the jury, I was making the argument based on the reasonableness of the Defendant's actions based on apparent danger and his perceived, reasonable belief that the victim owned a gun and was coming towards him in a threatening and aggressive manner.

I was aware that the victim owned several firearms and that he frequently carried a pistol in the glove compartment of his vehicle.  However, I was also aware that police investigated this issue and determined that all of the victim's firearms were accounted for by his wife and that from the victim's phone and text messages the night of the murder, it did not appear that he had had the opportunity to go to his house to retrieve a firearm between the time of his initial encounter with the Defendant to the time of the murder . . . .

12

As defense counsel articulated, he decided not to make an issue of whether or not Green had fired a weapon because (1) multiple people at the scene had GSR on their hands, (2) the GSR on Green's hands could have come from touching his own wounds, (3) no gun was found in Green's car, and, in fact, all of his guns were accounted for, (4) there were no bullets in appellant's car, even though his car was parked at point blank range to Green's car, and (5) there was expert testimony of there being no evidence that Green had fired a gun. Rather than focus the jury on whether or not Green had fired a weapon at appellant, defense counsel chose to pursue a tactic that, even if Green did not have a weapon, appellant's actions in shooting him were self-defense. Defense counsel correctly argued that self-defense was available even if appellant did not see Green with a weapon. *See Garcia v. State*, 492 S.W.2d 592, 596 (Tex. Crim. App. 1973) (holding defendant entitled to self-defense instruction when she shot husband who was advancing on her with his hand behind his back, and he had earlier threatened to kill her); *see also Hamel v. State*, 916 S.W.2d 491, 493 (Tex. Crim. App. 1996) ("A person has the right to defend himself from apparent danger to the same extent as he would if the danger were real."); *Jones v. State*, 544 S.W.2d 139, 142 (Tex. Crim. App. 1976) ("[I]t was not necessary that the jury find that the deceased was using or attempting to use unlawful deadly force against appellant in order for appellant's right of self-defense to exist. It would be sufficient if the jury found that the appellant reasonably

believed, as viewed from his standpoint at the time, that deadly force, when and to the degree used, if it was, was immediately necessary to protect himself against the use or attempted use of unlawful deadly force by the deceased."). Defense counsel was concerned that if he made his self-defense theory appear to hinge on whether or not Green had fired a gun, the jury would reject self-defense if it determined that Green did not have a gun. Indeed, defense counsel argued at the close of the guilt-innocence phase that no gun was necessary to support self-defense:

> See, the crux of this thing is, was there a weapon in Mr. Green's car, did he see a weapon, did they find a weapon? Guess what? [The jury charge] says: No, you don't have to have that. It's about what you perceive and did you perceive that to be real?
>
> * * * *
>
> [O]ne of the things I highlighted is it is not necessary that there be an actual attack or attempt. That's not necessary. What's necessary is that you felt the need to defend yourself under those circumstances.
>
> * * * *
>
> Do you believe that Mr. Carter reacted too quickly? I don't. Why? Not but 15 minutes ago, maybe ten minutes ago you were chasing me around and you wanted to do something to me. And it didn't appear to be very nice of what you wanted to do. And you knew I had a weapon. So, my perception is that you didn't come flying around here empty handed. You came with intention to cause me harm. So, I'm going to protect myself. And that's what [appellant] did. That's called self-defense.

While another attorney may have chosen a different strategy, given defense counsel's explanation of his trial strategy regarding the GSR evidence, we cannot

say that defense counsel's strategy was objectively unreasonable. Thus, on this record, defense counsel's decision not to introduce the GSR evidence did not deprive appellant of effective assistance of counsel.

**Failure to Introduce Shell Fragments of "Undetermined Origin"**

The firearms expert's report noted two shell fragments found at the scene that were of "undetermined" origin—one lead fragment "that lacks individual, as well as class characteristics and was unsuitable for microscopic comparison," and "a jacket fragment fired from a firearm with pologonal rifling of an undetermined caliber-class." At the motion for new trial hearing, appellant asserted that defense counsel was ineffective for failing to use this evidence because "the presence at the scene of these fragments of undeterminable origin might have corroborated [Green's] having fired at [appellant] . . . ."

When asked why he did not question the firearms expert about the shell fragments of undetermined origin, defense counsel stated:

> The undetermined casing could have very well been from—and she could have answered the question as it being from [appellant's] weapon or it could have been from another weapon. I didn't want to ask an open-ended question.

Defense counsel reiterated that his trial strategy was not to focus on the possibility of Green having a weapon, which he felt he could not prove, but to show that appellant's response was reasonable self-defense, even if he did not see a weapon. Specifically, defense counsel stated:

15

Going down the trial strategy again, there were a couple of thoughts. And as the evidence unfolded from the stand as well, the issue was [appellant] was in fear of his life and [Green] was the aggressor. No weapon being found was secondary to the issue of the fact that according to the law you don't have to have a weapon if you feel that what you are doing is justified and you can show it. The fact that [Green] came rushing up on him in his vehicle and another witness testified to that, the fact that [Green] was chasing this man earlier, a few minutes earlier, while he had a weapon in his hand, showed that [Green] clearly was the aggressor. The fact that [Green] had alcohol in his system above the legal[] limit show that [Green] was possibly the aggressor in that circumstance, and that [appellant] had a right to defend himself from that. And I still believe that he does and did.

And that was the approach at the time of the trial. So, I was not trying to highlight the issue and make an issue of the weapon, because with no weapon, I felt like the jury, from voir dire on forward, would find and only focus on the weapon.

As with the GSR evidence discussed above, defense counsel's decision not to focus on whether Green had a gun, a fact defense counsel felt that he could not prove given the absence of a gun at the scene or bullet holes in appellant's car, was not objectively unreasonable. Thus, on this record, defense counsel's choice not to introduce the shell fragment evidence did not deprive appellant of effective assistance of counsel.

**Failure to Seek Out Fact Witnesses**

Appellant also contends that defense counsel was ineffective for failing to seek out fact witnesses that would have testified (1) about seeing someone near Green's Jeep and possibly removing something from the jeep, and (2) about

16

appellant's reputation for peacefulness and Green's reputation for violence. Again, we address each issue respectively.

At the motion for new trial, appellant's younger brother, Brian Carter, alleged in an affidavit that he had seen someone run to Green's Jeep, appear to take something out of the Jeep, and then run behind a house. Defense counsel explained in his affidavit that he never spoke to Brian Carter because, even though he asked appellant for the names and phone numbers of potential witnesses, appellant never mentioned that his own brother might have evidence relevant to his self-defense strategy.

> The Defendant did not tell me until after the trial was over that his brother, Brian Carter, purportedly saw a black male go to the victim's jeep before [sic] the shooting and remove something from the car. None of the witnesses to the shooting or its immediate aftermath ever mentioned that Brian Carter had been on the scene to witness anything. Additionally, the witnesses told police and testified that they did not see anyone approach the vehicle or remove anything from the vehicle. I discussed these issues with the assistant district attorney handling this case and I was aware that the State had interviewed the victim's brother and the complainant's nephew, both of whom categorically denied having taken anything from the victim's vehicle prior to the arrival of police and paramedics. The State also informed me that the victim's nephew is currently an active duty member of the military with no criminal history, which would likely have given him increased credibility with a jury and would have made it difficult to prove to a jury that he had intentionally tampered with evidence in order to frame the Defendant for murder. In trial, I made the strategic decision to present the argument to the jury that it did not matter whether the victim actually had a gun in his vehicle so long as it was reasonable for the Defendant to have believed that the victim had a gun and was about to use it at the time the Defendant used deadly force. The decisions I made

17

regarding which witnesses to present and what evidence to highlight for the jury were made with that strategic goal in mind.

Defense counsel's failure to question appellant's brother was reasonable since appellant never even mentioned the possibility that his own brother might have relevant information until after appellant's conviction. *See Strickland*, 466 U.S. at 691 ("Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.").

Two other people—Aaron Johns and Jennifer Dangerfield—provided affidavits suggesting that they saw Braelon Green, appellant's nephew, go near the Jeep after the murder. As defense counsel explained above, he discussed this issue with police, found out that Braelon had denied taking anything from Green's Jeep, and that he decided not to pursue that line of questioning because he believed that Braelon, an active duty member of the military with no criminal record, would be a very credible witness before a jury if he denied removing a weapon from Green's Jeep. Instead, defense counsel chose to pursue his original trial strategy, which did not rely on the existence of a gun in Green's possession. Thus, on this record, defense counsel's to not interview Brian Carter or obtain witness statements to suggest that Braelon or someone else had removed a gun from Green's Jeep was not

18

objectively unreasonable and did not deprive appellant of effective assistance of counsel.

We next consider whether defense counsel was ineffective for failing to obtain witnesses to testify about appellant's reputation for peacefulness. Specifically, appellant alleges that defense counsel was deficient because "he neither sought out, nor called any of the many people in Barrett Station that would have vouched for [appellant's] peaceful nature[,]" and "[n]either did [defense counsel] investigate the aggressive nature of the decedent by interviewing people in the community." In support of a new trial on this ground, appellant offered the affidavits of numerous people willing to testify as to his peaceful nature, as well as several people who had witnessed a previous physical altercation between appellant and Green, and who believed that Green initiated that altercation.

When asked at the motion for new trial hearing why he did not further investigate the peaceful nature of appellant or the violent nature of Green, defense counsel responded:

> I'm aware that there were violent acts committed by Mr. Green and [appellant]. And after talking with [appellant], I advised him that we shouldn't bring up certain ones of those violent acts because of the way he may look.
>
>     * * * *
> As I mentioned earlier, I didn't find any evidence from the research that I had done that would have substantiated that Earl Green had prior aggressions. In addition to that, there were instances that I talked with [appellant] about. Mr. Green and [appellant] had an extensive history

> between the two of them. Once learning about what Mr. Carter's version of those histories were, my fear was that it would indicate that [appellant] was the prior aggressor.
>
> For instance, there was one situation where they had a fight and [appellant] pulled a knife on [Green]. I said: We cannot present that.

Defense counsel was correct that, had he offered evidence of appellant's or Green's reputation for peacefulness or the lack thereof, the State could have cross-examined the character witness with "relevant specific instances of the person's conduct." *See* TEX. R. EVID. 405(a)(1). After discussing with appellant the earlier altercations between appellant and Green, defense counsel made the strategic decision not to explore any reputation evidence because he did not want the jury to know that, on a prior occasion, appellant had pulled a knife on Green during a fight. Even if Green had been the aggressor in that altercation, as suggested by the affidavits offered by appellant at the new trial hearing, it was reasonable for defense counsel to conclude that the evidence was best not presented to the jury because appellant had pulled a knife on an unarmed man and arguably escalated the altercation. And, in the charged offense, appellant had again used a weapon against an unarmed man.

Defense counsel also stated that he did not obtain any reputation evidence because "[appellant] had extraneouses. He had an event that occurred earlier that night where there was a shooting—." The "event" to which defense counsel refers was a shooting that took place at a night club in La Porte on the same night as the murder, using the same weapon. At the motion for new trial, appellant suggested

20

that, had defense counsel further investigated this event, he would have discovered that appellant was not a suspect in the earlier shooting, but that the police suspected the State's witness, Demond Frank.

However, even if Frank were the shooter in the earlier event, the State could still have cross-examined any reputation witnesses about whether they were aware that somehow appellant came to be in possession of a gun that Frank had used earlier that night to shoot someone. Defense counsel could have been concerned that such evidence would raise an issue of whether appellant had aided or abetted Frank in some way by taking Frank's gun, which appellant then later used to shoot Green.

Thus, on this record, defense counsel's choice not to seek out and introduce evidence of appellant's and Green's reputations for peacefulness was not objectively unreasonable and did not deprive appellant of effective assistance of counsel.

**Punishment**

Appellant also contends that defense counsel was ineffective based on his decision to have only two witnesses—appellant's wife and cousin—testify on his behalf at the punishment hearing. Appellant argues that many people in the community would have been willing to provide mitigating evidence for appellant, and in support showed the trial court at the motion for new trial hearing 28 letters written on his behalf.

**Failure to Present Sufficient Mitigating Evidence**

21

When questioned about his decision to call only two witnesses at punishment, defense counsel explained:

> I made the decision to limit the testimony to just the Defendant's wife and cousin because I felt they would best be able to present the positive aspect of the defendant's character and history to the judge. Because the Defendant had elected to go to the judge for punishment instead of the jury, I felt that it would be more persuasive to limit the number of redundant witnesses.

This case is unlike *Shanklin v. State*, 190 S.W.3d 154, 164–65 (Tex. App.—Houston [1st Dist.] 2005), *pet. dism'd, improvidently granted*, 211 S.W.3d 315 (Tex. Crim. App. 2007), in which this Court found ineffective assistance of counsel when defense counsel did not interview or present any character evidence at punishment, and his decision not to call witnesses was not the result of "any reasoned trial strategy." Here, defense counsel made a reasoned, strategic choice to limit the character witnesses to the two that he thought would be more persuasive to the judge, and to avoid having several witnesses testifying to essentially the same information. The decision to call a witness is generally, as it was here, a matter of trial strategy. *State v. Thomas*, 768 S.W.2d 335, 337 (Tex. App.—Houston [14th Dist.] 1989, no pet.). And, "[e]ven if such [additional mitigating] evidence existed, defense counsel could have reasonably determined that the potential benefit of additional witnesses or evidence was outweighed by the risk of unfavorable counter-testimony." *Bone v. State*, 77 S.W.3d at 835 (citing TEX. R. EVID. 404(b), 405, 608).

We overrule appellant's sole issue on appeal.

## CONCLUSION

We affirm the trial court's judgment.


                                                Sherry Radack
                                                Chief Justice

Panel consists of Chief Justice Radack and Justices Jennings and Lloyd.

Jennings, J., dissenting

Publish.   TEX. R. APP. P. 47.2(b).