**AFFIRM; and Opinion Filed August 20, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-01193-CR

### LEONARD DESHAWN SCOTT, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the 204th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F14-45581-Q**

# MEMORANDUM OPINION

Before Justices Francis, Fillmore, and Whitehill
Opinion by Justice Fillmore

A jury found Leonard DeShawn Scott guilty of aggravated sexual assault and assessed punishment at forty years' imprisonment. In four issues, Scott asserts the evidence is insufficient to support the judgment, the trial court erred by admitting evidence of extraneous offenses during the guilt phase of trial, and he received ineffective assistance of counsel. We affirm the trial court's judgment.

## Background

M.P. testified that, in 2006, she lived a double life as a registered nurse specializing in pediatrics and as a "closet user of crack cocaine." She worked Monday through Thursday, and over the long weekends, on holidays, on her birthday, or when she had time off work, she would

go on three-or-four-day drug binges. During these binges, M.P. would buy a large quantity of crack cocaine and use it at a friend's "smoke house" until she reached a state of "oblivion." Sometimes, when M.P. ran out of money, she would commit acts of prostitution so that she could buy more crack cocaine. M.P.'s binges ended when she ran out of money to buy more drugs or became too tired to continue.

On April 19, 2006, M.P. began a crack cocaine binge at her friend's house. After three or four days, M.P. was tired and ready to go home. M.P. testified that, on April 22, 2006, she was walking down the street late at night, flagged down Scott's passing car, and asked him for a ride home. Scott agreed to take M.P. home, but told her he needed to first make a stop at his house.

According to M.P., Scott drove to a dark house and they both went inside. Scott took M.P. into a room where there were mattresses piled against the windows and walls and sports jerseys hanging on the wall. Scott pulled out a large gun and informed M.P. that she was going to perform oral sex on him and on his "homeboys." M.P. testified that, although Scott never pointed the gun at her or threatened to kill her, she thought he might kill her if she did not comply. Scott ordered M.P. to first perform fellatio on him and then on his companions who were waiting in another room. After M.P. performed fellatio on Scott, he told the next man, "if she doesn't do it right, let me know." According to M.P., there were five men present, but she had to perform fellatio on only four of them. The fifth male present refused to participate, but simulated having fellatio with M.P. so she would not get into trouble with Scott. M.P. described Scott as the ringleader of the group.

According to M.P., after she performed fellatio on two of his companions, Scott returned and had sexual intercourse with her. M.P. testified Scott placed a plastic grocery produce bag over

–2–

his penis to use as a condom. M.P. described the intercourse as painful because the bag created "pressure."

M.P. denied consenting to any of the sex acts or receiving money or drugs as compensation for her services. M.P. estimated the entire ordeal took a couple of hours. After the sexual assaults were over, the men gave M.P. a 7Up to drink and then left in Scott's car. M.P. wandered into a nearby road where a passing motorist saw her sitting on the grass in the roadway median. The motorist testified at trial that M.P. was crying and obviously upset and in pain. The motorist called the police.

After M.P. declined medical attention, Detective Allen Goehring interviewed her at the police station. Goehring testified he did not obtain much information from M.P. because she was tired, coming down from being high, and traumatized. One or two days later,[1] while trying to obtain money to buy crack cocaine, M.P. solicited an undercover police officer and was arrested for prostitution. Goehring interviewed M.P. again at the jail and found her much more coherent and cooperative than in her first interview. During the second interview, M.P. provided more details about the sexual assault. She also admitted that she flagged down Scott's vehicle with the intent of offering to perform fellatio on him in exchange for twenty dollars. According to Goehring, some of the details of M.P.'s narrative, such as her description of Scott's clothes, the age of Scott's car, and when Scott told M.P. that he had a gun, changed between the first and second interviews. Regarding the gun, Goehring testified M.P. never said Scott actually displayed the gun; rather, she indicated Scott told her he had one, either when she first climbed into his car (the first interview) or later after she and Scott entered the bedroom where the sexual assault occurred (the second interview).

---

[1] M.P.'s and Goehring's trial testimonies differed as to the number of days.

Based on M.P.'s more coherent account and the details she provided about the offense location, Goehring was able to identify a house where the assault occurred. In discussing the house with a police sergeant, Goehring learned a missing person report had been filed regarding N.W., a young woman who lived at that address. N.W.'s mother, B.W., had reported to police that N.W. had disappeared before a family trip.

According to B.W., the family trip began on April 22, 2006. N.W., who was almost eighteen years old at the time, was not home when it was time to leave. B.W. testified N.W. had been "running with quite a wild crowd," and had previously hosted parties at the house. Further, B.W. "had a lotta things stolen" and people had broken into the house. N.W., however, had never "disappeared" before. B.W. ultimately decided the family would go on the trip without N.W. B.W.'s family returned from their trip on the evening of April 23, 2006.

Goehring obtained consent from B.W. to search the house. Inside, Goehring discovered the bedroom M.P. had described with the mattresses pushed against the walls and sports memorabilia on the walls. From the floor, officers recovered a plastic grocery produce bag. B.W. testified the bedroom belonged to her son who was away at college and no one had entered the bedroom between the time she returned from her trip and the time the police searched the residence. She also testified that there was no reason why a produce bag would be in her son's bedroom.

B.W. testified that N.W. returned home in May 2006. According to B.W., N.W. had called a family friend to come and get her from a hotel. B.W. described N.W. as crying hysterically. N.W. told B.W. that she had been kidnapped and had become part of a "sex ring." Goehring testified that he interviewed N.W after she returned home. N.W. told Goehring that she had seen Scott on April 22, 2006, and he was wearing a dark tank top and baggy blue denim shorts.

Goehring testified this matched the description M.P gave during her second interview of the clothes Scott was wearing at the time of the sexual assault.

N.W. testified she met Scott in 2006 at a convenience store in the same area where the sexual assaults occurred. N.W. had dropped out of high school, was "running with a bad crowd," and was using alcohol and marijuana. Rather than go on her family's trip in April 2006, N.W. stayed behind to be with Scott. After her family departed for the trip, N.W. brought Scott to her house during the day to have sex in her bedroom. N.W. described the sex as consensual, but very aggressive and indicated Scott used a condom. According to N.W., she and Scott did not go into her brother's room, but Scott roamed about the house by himself. N.W. testified Scott knew her family was out of town and when they would return. According to N.W., Scott wanted her to become a prostitute as an easy way for them to make money. N.W. testified Scott took her to Harry Hines Boulevard and left her "on the street to turn tricks." N.W. returned home about a month later. N.W. believed Scott carried a gun.

After interviewing N.W., Goehring prepared a photographic lineup containing Scott's picture for M.P. to review. M.P. was unable to identify Scott as the man who sexually assaulted her.

The evidence collected at N.W.'s residence was sent to the crime lab for analysis. A forensic scientist testified the substance recovered from the inside of the plastic bag was tested and identified as male DNA; however, the identity of the contributor was unknown. This DNA profile subsequently was compared to a DNA profile obtained from Scott's buccal swabs. The comparison showed Scott was the contributor of the DNA obtained from the inside of the plastic bag and the probability of error in the match was one in 5.7 quintillion. DNA testing also determined that M.P. was the contributor of the DNA found on the outside of the bag and the

–5–

probability of error in the match was one in 6.57 quadrillion. Scott's DNA and the DNA of an unknown female were also found on a pair of underwear collected at N.W.'s house.

Richardson Police Detective Chiron Hale testified that, in 2014, he was in charge of M.P.'s still unresolved case when a CODIS match was made to Scott.[2] Hale's interview of Scott was audiotaped and played for the jury. During the interview, Scott denied sexually assaulting anyone, engaging in sex involving multiple other men, knowingly having sex with prostitutes or picking up a "crackhead" on the side of the road, being in the area where the offense occurred, and using a produce bag as a condom. Hale testified he knew at the time of the interview that Scott previously had been convicted of sexually assaulting a sixteen-year-old girl.

The jury also heard evidence about two extraneous offenses involving victims C.S. and G.G. that occurred within a few miles of where M.P. was sexually assaulted. Dallas Police Detective Allen Holmes testified he was a patrol officer in the early morning hours of May 2, 2006, when he responded to a call about a hysterical woman who had entered a pharmacy. When Holmes arrived, he found C.S. distraught and frantic. C.S. told Holmes that she had been sexually assaulted. C.S. took Holmes to the location where the offense occurred, which was a townhouse under construction near the neighborhood where M.P. was assaulted. C.S.'s shoes were outside in the street. Inside, Holmes found blood, a crack pipe, and a Starbucks coffee cup.

C.S. told Holmes that she was walking along Forest Lane when a driver approached her and asked for a date. She was on her way home and declined. She tried to run away, but the man chased her down and forced her into his car. C.S. said the man took her to the townhouse where he forced her to perform oral sex, penetrated her vaginally, tried to penetrate her anally, and ejaculated on her face. The man told C.S. that he had a gun and was going back to his car to get

---

[2] CODIS is an acronym for the Combined DNA Index System database of DNA samples sponsored by the Federal Bureau of Investigation. *See* TEX. GOV'T CODE ANN. § 411.141(1) (West 2012).

it. C.S. ran toward the pharmacy, losing her shoes along the way. C.S. was transported to Parkland Hospital where DNA evidence was collected. The DNA evidence, however, was not tested at that time.

Nine years later, Holmes was a detective and was assigned C.S.'s case as a cold case. Money was available from a federal grant to test old rape kits, and the DNA evidence recovered from C.S. was tested. That testing resulted in a CODIS match with Scott's DNA. Holmes located C.S., who he described as a "white female" who was living as a homeless, drug-addicted prostitute. Holmes showed C.S. a photographic lineup that contained Scott's picture, but C.S. could not identify Scott as the man who assaulted her. Holmes then showed C.S. a photograph of Scott and asked her if he had been a consensual sex partner. C.S. told Holmes that Scott was not a consensual partner. She also said Scott could not have been one of her customers because she generally did not have sex with African-American men and had a stable "client list" of regular customers whom she would recognize. On cross-examination, Holmes admitted C.S. had not totally foreclosed the possibility that she had sex with a black male client.

In June 2016, Holmes interviewed Scott and asked him about his prior relationships; whether, nine years earlier, he had sex with prostitutes, had gone to a lot of parties, or had sex with unknown people; and if he remembered having sex with a white woman. Scott told Holmes that he had a white girlfriend at one time, but preferred to have sex with black women. Scott also told Holmes that he had sex with a number of people in that time period, including strippers, but did not have sex with street prostitutes. Holmes showed Scott a photographic lineup that included a picture of C.S., and Scott did not identify C.S. as one of his sexual partners.

A forensic DNA analyst testified Scott's DNA profile was compared to a DNA profile obtained from vaginal and facial swabs taken from C.S. following the sexual assault. The

comparison showed that Scott was the contributor of that DNA and the probability of error in the match was one in 47 sextillion for African-American males.

G.G. testified she was sexually assaulted on March 19, 2006, when she was sixteen years old. According to G.G., a boy she knew from high school, Marquais, and another man, who she also knew, persuaded her to leave home with them to make a music demo tape. The men took G.G. to a motel where there were four men present, but no recording equipment. The motel room was in the same area where M.P. was assaulted. When G.G. expressed reservations about going into the room, Marquais told her to "shut up" and gave her a green liquid to drink that made her feel "fuzzy" and caused her to hallucinate. When she told Marquais that she wanted to leave, he again told her to "shut up" and gave her more of the green liquid to drink. The men took her into the bathroom and sexually assaulted her one at a time. Two of the men forced her to perform fellatio on them. G.G. identified Scott as having forced her to have vaginal intercourse with him. The men then took her into the bedroom where Marquais held her down on the bed. After again protesting that she wanted to leave, and being given another cup of the green liquid, G.G. passed out on the bed. When she woke up the next morning, she was "bloody" and there were condoms all over the floor. G.G. denied she consented to any of the sex acts. She also denied ever being a prostitute or a drug user. After a police investigation, Scott was arrested and pleaded guilty to aggravated sexual assault of G.G.

### Sufficiency of the Evidence

In his second issue, Scott contends the evidence was insufficient to support the judgment because no rational jury could conclude the State proved beyond a reasonable doubt that M.P. did not consent to having sex with Scott. As charged in this case, a person commits aggravated sexual assault by intentionally or knowingly causing the sexual organ of another person, without that

person's consent, to contact the sexual organ of another person, including the actor, and by acts or words occurring in the presence of the victim, threatening to cause the death, serious bodily injury, or kidnapping of any person. *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(A)(iii), (2)(A)(ii) (West Supp. 2017). As relevant to this case, a sexual assault occurs without consent if "the actor compels the other person to submit or participate by threatening to use force or violence against the other person or to cause harm to the other person, and the other person believes that the actor has the present ability to execute the threat." *Id*. at §§ 22.011(b)(2), 22.021(c).

We view the sufficiency of the evidence under the standard set out in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *Fernandez v. State*, 479 S.W.3d 835, 837 (Tex. Crim. App. 2016). We examine all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Zuniga v. State*, No. PD-0174-17, 2018 WL 2711145, at *2 (Tex. Crim. App. June 6, 2018). This standard recognizes "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *see also Nisbett v. State*, No. PD-0041-17, 2018 WL 3134030, at *14 (Tex. Crim. App. June 27, 2018). The factfinder is entitled to judge the credibility of the witnesses and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991); *see also Zuniga*, 2018 WL 2711145, at *2.

We defer to the factfinder's determinations of credibility and may not substitute our judgment for that of the factfinder. *Jackson*, 443 U.S. at 319; *see also Nisbett*, 2018 WL 3134030, at *14 ("An appellate court cannot act as a thirteenth juror and make its own assessment of the evidence."). When there is conflicting evidence, we must presume the factfinder resolved the

conflict in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326; *Zuniga*, 2018 WL 2711145, at \*2. Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor and, alone, can be sufficient to establish guilt. *Nisbett*, 2018 WL 3134030, at \*14. "Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction." *Id*.

M.P. testified she did not consent to sexual intercourse with Scott. Scott, however, argues M.P.'s testimony should be discounted because the described events occurred eleven years prior to trial and on the fourth day of M.P.'s extended crack cocaine binge. Scott points to M.P.'s testimony that, when she was on a binge, she would buy enough crack cocaine to take her to "oblivion" and the binge would not end until she ran out of money or got so tired she had to stop. Scott contends that, due to drug use and lack of sleep, M.P. did not remember the events clearly. Scott also notes that M.P. was arrested within a couple of days after his interaction with her for soliciting clients for sex in order to obtain the money necessary to buy more crack cocaine, indicating her crack cocaine binge continued even after the alleged offense occurred.

Scott hypothesizes that on the night of the offense, M.P. wanted more crack cocaine and left the drug house to obtain money by performing acts of prostitution. Scott suggests M.P. flagged him down and engaged in consensual oral sex for money, either in the car or at N.W.'s house. Scott contends that, because the house was in a nice neighborhood and M.P. thought it belonged to him, she believed he would have the money she needed to buy more crack cocaine. Scott asserts it is reasonable to deduce from the evidence that M.P. and Scott agreed to have intercourse for a fee. Scott further hypothesizes that he discovered he had no condoms and so improvised with the grocery produce bag. Scott argues it is reasonable to deduce from the evidence that the painful sex with the grocery bag led to M.P. "not enjoy[ing] herself," that she and Scott argued, and her

–10–

fee was not paid. Scott theorizes this led to M.P. being kicked out of the house, strung out on drugs, exhausted, and angry at Scott. Scott asserts nothing M.P. testified to about the event being a sexual assault "was even remotely true" and no reasonable jury would have believed the intercourse between Scott and M.P. was not consensual.

Scott's "reasonable deductions" and theories directly conflict with M.P.'s testimony. M.P. testified a man, who was subsequently identified as Scott through DNA testing, lured her into the car with the offer of a ride home, took her to N.W.'s house instead, sexually assaulted her orally and vaginally without her consent while threatening her with a gun, and orchestrated three other sexual assaults against her by his companions. On cross-examination, M.P. flatly denied trial counsel's suggestion that she offered to have sex with Scott for money. She admitted there might be inconsistencies between her testimony and the initial police report about the offense because, during the initial interview, she was tired, coming down from her binge, and in shock after being sexually assaulted by several men. However, at trial, M.P. insisted she had a clear recollection of the offense.

It was the jury's prerogative to believe M.P.'s trial testimony and not draw the deductions Scott would prefer. *See Chambers*, 805 S.W.2d at 461; *see also Zuniga*, 2018 WL 2711145, at *2. Regardless of any conflicts within M.P.'s various accounts to police and her trial testimony, the jury found her to be credible regarding the sexual assault. We defer to that determination. *Jackson*, 443 U.S. at 326; *Zuniga*, 2018 WL 2711145, at *2. We conclude a rational jury could have found each element of the offense beyond a reasonable doubt. Accordingly, we resolve Scott's second issue against him.

**Extraneous Offense Evidence**

In his third and fourth issues, Scott contends the trial court erred by admitting evidence of the extraneous offenses he committed against C.S. and G.G. Scott specifically argues the only contested issue at trial was consent and, because neither extraneous offense is probative on that issue, the extraneous offenses were improper evidence of character conformity.

We review trial court rulings on the admissibility of evidence under an abuse of discretion standard. *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). "A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement." *Id*. This discretionary standard of review applies to cases where the ruling at issue involves the admissibility of extraneous-offense evidence offered to rebut a defensive theory. *Dabney v. State*, 492 S.W.3d 309, 318 (Tex. Crim. App. 2016).

Evidence of a "crime, wrong, or other act" is inadmissible to prove a person's character if its sole relevance is to show the person acted on a particular occasion in accordance with their character. TEX. R. EVID. 404(b)(1); *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001). It may, however, be admissible when it is relevant to a fact of consequence, such as rebutting a defensive theory, and is not offered to show character conformity. *Powell*, 63 S.W.3d at 438; *see also* TEX. R. EVID. 404(b)(2). Extraneous-offense evidence may be admissible if it "logically serves to make more or less probable an elemental fact, an evidentiary fact that inferentially leads to an elemental fact, or defensive evidence that undermines an elemental fact." *Martin v. State*, 173 S.W.3d 463, 466 (Tex. Crim. App. 2005). When the defense presents a defensive theory in opening statement, it may open the door to admission of extraneous-offense evidence relevant to rebut the defensive theory. *Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008).

From opening statement onward, the defense admitted Scott had sexual intercourse with M.P., but posited that M.P. and Scott engaged in a consensual prostitution transaction. Through argument and cross-examination of the State's witnesses, the defense tried to convince the jury that M.P.'s account was not credible because of her condition at the time of the offense and the inconsistencies in her interviews with police, and that she had engaged in consensual sex with Scott. During cross-examination, the defense pressed M.P., unsuccessfully, to admit she had agreed to have sex with Scott for money so that she could obtain more crack cocaine. The defense sought to foster the inference that M.P. falsely accused Scott of sexual assault because she had not been paid for her prostitution services.

In a sexual assault prosecution, when the defense admits the defendant had sex with the victim, but raises a theory that the victim consented to the sex acts, the defense places in issue the defendant's intent to commit the offense. *Casey*, 215 S.W.3d at 880; *Rubio v. State*, 607 S.W.2d 498, 500–01 (Tex. Crim. App. 1980). The State may then offer into evidence extraneous offenses that are relevant to show lack of consent and intent to commit the offense. *Casey*, 215 S.W.3d at 879–80; *Rubio*, 607 S.W.2d at 501. When offered to prove a material fact other than the defendant's propensity to commit crimes, evidence showing the defendant used a "distinctive and idiosyncratic" modus operandi in committing extraneous offenses is a recognized exception to rule 404(b)'s general exclusion of extraneous offense evidence. *Martin*, 173 S.W.3d at 467–68. Modus operandi evidence may be used to shed light on a disputed issue of lack of consent. *See Casey*, 215 S.W.3d at 881.

The extraneous offenses against C.S. and G.G. share a distinctive and idiosyncratic pattern with the offense against M.P. All three offenses involved female victims who were lured or forced into an automobile and driven to another location where the offense took place. All three offenses

were committed within a span of a few months and took place in proximity with each other. In all three cases, the assailant or assailants drove away leaving the victim at the offense location. All three offenses involved victims who were under the influence of intoxicants at the time of the offense. Two of the offenses involved multiple assailants. Two of the offenses involved threats of using a gun if the victim did not comply. Two of the offenses involved women who were approached while walking down the street and who at least sometimes engaged in prostitution.

By raising the defensive theory that Scott and M.P. engaged in consensual sex acts involving prostitution, the defense opened the door to the admission of rebuttal evidence that would be probative of M.P.'s consent and Scott's intent to sexually assault her. *See Casey*, 215 S.W.3d at 879–82; *Martin*, 173 S.W.3d at 466–68, *Rubio*, 607 S.W.2d at 500–01. This rebuttal evidence, including evidence of the two extraneous offenses, was relevant for reasons other than showing character conformity. *See Casey*, 215 S.W.3d at 880–82; *Martin*, 173 S.W.3d at 466; *Rubio*, 607 S.W.2d at 501; *see also* TEX. R. EVID. 404(b)(2). Accordingly, we conclude the trial court did not abuse its discretion by admitting evidence of the extraneous offenses. *See Casey*, 215 S.W.3d at 879. We resolve Scott's third and fourth issues against him.

**Ineffective Assistance of Counsel**

In his first issue, Scott contends trial counsel rendered ineffective assistance by failing to contest the admissibility of references to extraneous prostitution offenses that occurred during the testimony of N.W. Scott concedes that generally such a complaint is difficult to raise on direct appeal because the record does not reflect the rationale for trial counsel's actions. In this case, however, Scott contends the record is sufficient because the trial court questioned trial counsel about why he raised no objection and trial counsel admitted he had not read the State's rule 404(b) notice regarding extraneous offenses the State intended to rely on at trial.

–14–

Scott bears the burden of proving counsel was ineffective by a preponderance of the evidence. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). To prevail on a claim of ineffective assistance of counsel, Scott must show that (1) trial counsel's representation fell below an objective standard of reasonableness and (2) there is a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984); *see also Miller v. State*, 548 S.W.3d 497, 499 (Tex. Crim. App. 2018) ("To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate two things: deficient performance and prejudice."). Scott must prove both prongs of the test. *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). The deficient performance must be affirmatively demonstrated on the record and not require retrospective speculation. *Id*.

In evaluating counsel's performance, we look to the totality of the representation and the particular circumstances of each case. *Thompson*, 9 S.W.3d at 813. The issue is whether counsel's assistance was reasonable under the circumstances and consistent with prevailing professional norms at the time of the alleged error. *See Strickland*, 466 U.S. at 688; *Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013). Our review of counsel's representation is highly deferential, and we indulge in a strong presumption that counsel's conduct was not deficient. *See Strickland*, 466 U.S. at 689; *Nava*, 415 S.W.3d at 307–08. We judge the totality of trial counsel's representation rather than focusing narrowly on isolated acts or omissions, and the performance must be evaluated from the viewpoint of trial counsel at the time of the representation and not with the benefit of hindsight. *Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012).

Generally, a silent record that provides no explanation for trial counsel's actions will not overcome the strong presumption of reasonable assistance. *Rylander v. State*, 101 S.W.3d 107,

110–11 (Tex. Crim. App. 2003). Absent an opportunity for trial counsel to explain the conduct in question, an appellate court should not find deficient performance unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)); *see also Ex parte Saenz*, 491 S.W.3d 819, 828 (Tex. Crim. App. 2016) (noting that in absence of evidence of trial counsel's reasons for challenged conduct, an appellant court commonly "will assume a strategic motivation if any can possibly be imagined").

The record shows N.W. testified without objection that Scott:

> did introduce me to prostitution. He left me [in the] Harry Hines area on the street to turn tricks. . . . [H]e's not a good person. The things that he exposed me to—I have four daughters now. I don't know what I would do if one of my girls was exposed to anything that man ever exposed me to in my past back then.

Later, the State asked N.W. to describe the nature of her relationship with Scott at the time she had sex with him in her house shortly before the alleged offense against M.P. N.W. responded, "He had started talking about the whole prostitution thing. It was not really something that I wanted to do." The State then asked if Scott wanted N.W. to become a prostitute to which she replied, "Yes. He said it would be a quick easy way for us to make money."

Shortly thereafter, the State asked N.W. whether she and Scott stayed in the house after having sex. N.W. replied that Scott took her "to the Harry Hines area." When the State asked N.W. if she knew why Scott was taking her to "the Harry Hines area," trial counsel objected on the grounds of relevance and insufficient notice under rule 404(b). *See* TEX. R. EVID. 404(b) (prohibiting use of evidence of extraneous offenses to prove defendant's character but allowing such evidence with timely notice to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident). The trial court excused the jury and

–16–

held a short hearing during which it chided trial counsel, telling him. "You let her tell her whole story before we get an objection. . . ."

The trial court ascertained that the State had twice given the defense timely written notice of its intent to use the extraneous prostitution offense in its case-in-chief. Trial counsel admitted he had not read the notices. The trial court determined it would give the jury a limiting instruction and asked the State to not inquire further into allegations that Scott gave N.W. to another pimp. When the State asked whether it could go into N.W.'s disappearance for thirty days after going with Scott to the Harry Hines area, trial counsel objected on the grounds that her disappearance was related to the prostitution offense. The trial court responded: "Well, its [sic] about time, but we need— I don't know that we need to do much further questioning concerning the prostitution nature of [N.W.] and [Scott's] relationship. I thought we were concerned that her testimony can place him at the location of the alleged assault and the time line." After the jury returned, the State solicited from N.W. that she left the house with Scott to go to the Harry Hines area and did not return home until thirty days later.

Regarding the first *Strickland* prong, N.W.'s testimony about her relationship with Scott, in general, was admissible for the very reason the trial court mentioned—it provided probative evidence that Scott had visited N.W.'s home and he knew her family was away and the house was empty for the weekend. Therefore, until N.W. began testifying about Scott's suggestion that she engage in prostitution, trial counsel's strategy could have been to not make a meritless objection in front of the jury. *See Ex parte White*, 160 S.W.3d 46, 53 (Tex. Crim. App. 2004) (counsel not ineffective for failing to object to admissible evidence). Trial counsel's reasons for not objecting once N.W. began testifying that Scott tried to persuade her to become a prostitute are not in the record. N.W., however, did not testify that Scott forced or coerced her into prostitution. Given

–17–

that trial counsel's overall strategy was to generate reasonable doubt as to whether Scott's sex acts with M.P. were part of a consensual act of prostitution, it arguably could be viewed as positive for the defense if the evidence showed Scott was focused on consensual prostitution when he was with N.W. only a few hours before the offense occurred. *See Saenz*, 491 S.W.3d at 828. When the State attempted to introduce additional testimony showing Scott became N.W.'s pimp and eventually gave her to another pimp, Scott objected—arguably because that testimony did not support the defensive theory.

Nothing in the record before us shows definitively that trial counsel did not pursue a reasonable trial strategy while N.W. was testifying. *See id.*; *Thompson*, 9 S.W.3d at 814 (declining, without explanation from counsel, to find counsel ineffective for not objecting to evidence that counsel may at that moment have viewed as not inadmissible). Scott did not file a motion for new trial where an adequate record could have been developed exploring trial counsel's motivations and trial strategy. *See Goodspeed*, 187 S.W.3d at 392; *Rylander*, 101 S.W.3d at 110–11. Accordingly, Scott failed to establish that his trial counsel's failure to object was "so outrageous that no competent attorney would have engaged in it." *Goodspeed*, 187 S.W.3d at 392.

Finally, while trial counsel's failure to read the State's 404(b) notices would appear to be a departure from the norms of professional conduct, we cannot conclude Scott has shown that, but for trial counsel's ineffective assistance, the outcome of this trial would have been different. As we have already discussed, M.P.'s testimony, the DNA evidence, and the evidence of intent and lack of consent arising from the extraneous offense evidence, if believed, constituted compelling evidence of Scott's guilt. In light of the overwhelming evidence that Scott was guilty of sexually assaulting M.P., we cannot conclude the evidence Scott was also pressuring a young woman to become a prostitute had any effect on the jury's decision. "An error by counsel, even if

professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. Accordingly, Scott has not met his burden of showing the result would have been different but for trial counsel's alleged ineffective assistance. *See Strickland*, 466 U.S. at 694. We resolve Scott's first issue against him.

We affirm the trial court's judgment.

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

171193F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

LEONARD DESHAWN SCOTT,
Appellant

No. 05-17-01193-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 204th Judicial District
Court, Dallas County, Texas,
Trial Court Cause No. F14-45581-Q.
Opinion delivered by Justice Fillmore,
Justices Francis and Whitehill participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 20th day of August, 2018.